UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| SHARON MCDONALD,<br><br>  Plaintiff,<br><br>v.<br><br>COLISEUM MEDICAL CENTER, LLC<br><br>  Defendant. | Civil Action No.: 5:22-cv-00280-MTT |

**DEFENDANT COLUMBUS REGIONAL HEALTHCARE SYSTEM, INC.'S
REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 56, Defendant Coliseum Medical Center, LLC ("CMC") files this Reply in Support of its Motion for Summary Judgment.

I. INTRODUCTION

Few would mistake federal courts for personnel departments, yet McDonald would have this Court assume precisely that role. Her response to CMC's motion is awash in a sea of misunderstanding – both of the law and of her prior employer's intentions. While McDonald vehemently denies her poor work performance, acts of insubordination, and multiple other acts of misconduct, she mistakes the legal framework at hand. The question is not whether she performed poorly or committed misconduct in a factual sense, but whether CMC, *honestly believed* that she did, and then acted upon that belief. This distinction is not mere legalese; it is one of the crucibles by which employment discrimination cases regularly are tested in the Eleventh Circuit.

McDonald leans heavily on her own version of events, while casting CMC's proffered reasons for her termination as pretext. Yet, her arguments are tinged with irony: while accusing CMC of inconsistencies, McDonald stumbles over the legal standards and misapplies the applicable burdens of proof. As demonstrated below, not only has McDonald failed to meet her CMC's reasons "head-on," but her arguments overlook well-established law.

The undisputed evidence shows that CMC honestly believed that McDonald was a poor performer, that she was a flawed leader and manager, that she had mistreated subordinates and co-workers, and that she had engaged in numerous other acts of misconduct, culminating in two egregious acts of insubordination towards CMC leadership, inevitably leading to her termination. McDonald's Response offers no contradictory evidence, and it certainly offers no evidence that McDonald was discriminated against because of an FMLA request or a disability. Accordingly, CMC's motion for summary judgment should be granted.

II. ARGUMENT AND CITATION OF AUTHORITY

A.      **McDonald Fails to Establish Pretext on Her ADA and FMLA Retaliation Claims.**

### 1. McDonald's "Dispute" with CMC's Determinations is Insufficient.

McDonald admits CMC articulated a legitimate, non-discriminatory, and non-retaliatory reason for her termination – two acts of insubordination.[1] (Doc. 50, McDonald's Resp., p. 4.) She then proclaims, with no legal authority, that "these purported acts of insubordination are directly refuted by Ms. McDonald and therefore her claims must proceed to a jury." (*Id.*) But, McDonald applies the wrong analytical framework. To prove pretext, McDonald "must meet [CMC]'s reason head on and rebut it; [she] cannot simply recast [CMC's] reason, substitute [her] business judgment for that of [CMC], or otherwise quarrel with the wisdom of the decision." *Rollins v. Aaron's, Inc.*, No. 1:15-CV-57, 2017 U.S. Dist. LEXIS 229547, at *31 (M.D. Ga. Mar. 16, 2017) (quotations omitted). The "proper inquiry is whether [CMC] <u>believed</u> [McDonald] was guilty of misconduct and whether that belief was the reason for [her] discharge." *Winborn v. Supreme Beverage Co.*, 572 F. App'x 672, 675 (11th Cir. 2014) (emphasis added); *see also Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (same). "The question is not whether [McDonald] was insubordinate [or] broke a number of work rules … Instead, the question is whether [CMC was] dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or used those complaints about [McDonald] as a cover for … discrimination." *EEOC v. TBC Corp.*, 889 F. Supp. 2d 1368, 1379 (S.D. Ga. 2012).

To McDonald's chagrin, "federal courts do not sit as a super-personnel department that reexamines an entity's business decisions." *Robinson v. Colquitt EMC*, No. 7:13-CV-92, 2015 U.S. Dist. LEXIS 40874, at *29-30 (M.D. Ga. Mar. 31, 2015) (quoting *Elrod*, 939 F.2d at 1470).

---

[1] To be clear, CMC's decision to terminate McDonald was based not only on the two egregious acts of insubordination, *but also* on McDonald's overall poor leadership, poor work performance, other acts of misconduct, and a lack of improvement despite significant coaching and multiple opportunities to improve over the course of three months. (Doc. 43-3, Strong Dec., ¶ 78; Strong Dep. pp. 134-135; *see generally* Doc. 43-1, CMC's Stmt. of Facts, pp. 5-15.) McDonald does not even address this troublesome work history, which was sufficient, *on its own*, to warrant her termination. McDonald <u>cannot</u> establish "pretext" without addressing this lengthy history of poor work performance.

Indeed, federal courts "must be careful not to allow [discrimination] plaintiffs simply to litigate whether they are, in fact, good employees." *Alvarez v. Royal Atl. Dev., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). In other words, McDonald cannot simply express her disagreement with CMC's decision in order to create a jury issue. "[T]o show that [CMC's] reasons were a pretext, [she] must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [CMC's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Resler v. Koyo Bearings USA*, No. 1:12-cv-100, 2014 U.S. Dist. LEXIS 40701, at *14 (M.D. Ga. Mar. 27, 2014) (quoting *Alvarez,* 610 F.3d at 1265).

Moreover, McDonald "must establish not only that [CMC's] proffered reasons for her termination were ill-founded, but also that unlawful discrimination was the true reason for the termination." *TBC Corp.*, 889 F. Supp. at 1378. Ultimately, "Plaintiff must … prove pretext by a preponderance of evidence." *Story v. Sunshine Foliage World, Inc.*, 120 F. Supp. 2d 1027, 1040 (M.D. Fla. 2000).

McDonald presents no evidence of pretext; instead, she quibbles with CMC's determination that she committed two acts of insubordination. (*See* Doc. 50, pp. 5-9.) First, McDonald attacks CMC's determination that she was insubordinate to COO Scott Strong when, despite instructions, she failed to show up for a critical change-of-shift on Sunday, October 31, 2021. (*Id*. at 5-7.) McDonald's argument is not new; it is the same position she took during the November 1, 2021 telephone conference convened by Strong to investigate the incident. (*See* Doc. 43-6, pp. 6-10.) The argument is simple: McDonald claims she misunderstood Strong's expectations and thought he approved her (alleged) plan to arrive after change-of-shift on Sunday. (*Id*.; Doc. 50, pp. 5-6.) Of course, if the relevant question for purposes of summary judgment was "whether McDonald was insubordinate on October 31," then there would be a factual dispute here

(and the Court could serve as a "super-personnel department") – but that is not the question.  The proper question is "whether [CMC] honestly believed its reasons and acted in good faith upon them." *Resler,* 2014 U.S. Dist. LEXIS 40701, at *15. During the November 1 phone conference, Strong explained that he believed his expectations were clear, and that he and McDonald had "discussed the need to be there at change of shift in the morning on [her] unit on Sunday, and [they] discussed why that was important, and [she was] not there in the morning."  (Doc. 43-6, p. 8; *see generally*, Doc 43-1, CMC's Stmt of Facts, pp. 17-24 (discussing CMC's robust process for evaluating McDonald's conduct and making the decision to terminate her).)[2]

McDonald likewise quarrels with CMC's determination that she was insubordinate to House Supervisor Lindsey Wilson.  (Doc. 50, pp. 7-9.)  McDonald rehashes the same position she took during the November 1 investigation call, again arguing that her insubordination was a misunderstanding.[3]  (*Compare id*. to Doc. 43-6, Tele. Tr., Ex. 1, pp. 2-4.)  But, she presents no evidence that Strong and other CMC leaders participating in the investigation did not "honestly believe" she was insubordinate, based on the compelling information available to them (including, *e.g.,* a detailed written statement by Wilson (Doc. 43-3, Ex. 5.) and an admission by McDonald (during the November 1 call) that her conduct toward Wilson was "not…the best thing to do" (Doc. 43-6, Ex. A, p. 2)).  Instead, McDonald asks this Court to use the pretext framework to "sit as a super-personnel department [to] reexamine[] [CMC]'s business decisions." *Robinson,* 2015 U.S. Dist. LEXIS 40874, at *29-30.  The Court should not, and cannot; accordingly, CMC's

---

[2] McDonald also attempts to create an issue by stating that CMC falsely "claim[ed] Mr. Strong ordered *all* directors to be present at the Sunday morning shift." (Doc. 50, p. 6.)  McDonald is incorrect.  COO Strong very clearly testified that only "*critical* department directors" needed to be present for change-of-shift. (Doc. 43-3, Strong Dec. ¶ 48.)
[3] McDonald's reliance on *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 478 (5th Cir. 2015) to suggest that Wilson's statement is untrustworthy is misplaced. *Goudeau* involved written warnings "suspiciously" prepared several days after alleged incidents occurred and all at once. *Id*. In contrast, Wilson's statement was written within a few hours of the incident, at the request of Strong as part of his plan to investigate the incident. (Doc. 43-3, ¶ 65 and Ex. 5.)

motion for summary judgment should be granted.  *See TBC Corp.*, 889 F. Supp. 2d at 1379.

### 2. McDonald's Misinterpretation of Evidence Undermines Her Case.

McDonald next argues that part of CMC's proffered reasons for her termination – the two acts of insubordination on October 31, 2021 – is pretextual because CMC has offered "inconsistent" or "shifting" reasons for her termination. (Doc. 50, pp. 9-13.) Of course, as discussed above, CMC's reason for terminating McDonald has not changed since the November 1, 2021 investigative phone conference – the day after McDonald's insubordination.[4]  In that call, Strong clearly articulated that McDonald had been insubordinate (1) to him, by failing to be present for the October 31 change-of-shift; and (2) to Wilson, by contravening her orders. (Doc. 43-6, Ex. A, p. 1.)  CMC has advanced this same position throughout this litigation, including in its summary judgment motion: "McDonald committed two egregious acts of insubordination, warranting her immediate termination." (Doc. 43-2, p. 5.)

McDonald's inconsistencies are imagined.  For example, she argues that, on the November 4 call, Strong said "she was being terminated because she failed to timely check-in on the unit at shift change (as opposed to being present)." (Doc. 50, p. 9.)  The full transcript shows Strong said, "I wanted you to check in on the unit at change of shift **by being here**, given the critical staffing that we expected…. That didn't happen."  (Doc. 43-6, Ex. B, p. 1 (emphasis added).)  Next, McDonald argues that CMC's listing of "involuntary" (*i.e., against McDonald's choice*) as the reason for her termination on the required Georgia DOL "Separation Notice" is "inconsistent" with its position that McDonald's termination was for misconduct. (Doc. 50, p. 9.)  Very clearly, it is not.

---

[4] McDonald seems to confuse cumulative evidence with inconsistent evidence.  (*See* Doc. 50, McDonald's Response, p. 10 (complaining that, in response to her interrogatory asking for "all reasons for [her] termination," CMC did just that – it listed "all the reasons for [her] termination").)  Her argument that CMC's discovery responses are "inconsistent" because they highlighted not just the final two acts of insubordination, *but also* the long list of prior performance problems, flawed leadership and management abilities, and other acts of misconduct that paved the path toward her inevitable termination, is simply absurd.

McDonald then devotes several pages to various imagined inconsistencies (*see* Doc. 50, pp. 10-13), but each one fails upon examination. For instance, McDonald tries to invent an inconsistency through a semantic "gotcha" game concerning CMC's counsel's use of the term "senior manager" versus "director." (*Id*. at 10.)  Similarly, McDonald takes issue with whether there were "two" or "three" complaints of retaliation by McDonald's co-workers.  (*Id*. at 10-11.) Setting aside the obvious question ("*Just how many acts of retaliation is enough to constitute misconduct?*"), the alleged "inconsistency" in this case simply lies in the witness testimony. CMC's corporate representative Angie Walker testified that she was aware of <u>two</u> incidents of retaliation, but then noted, "I'm sure Scott Strong will get into more of the details." (Doc. 47, p. 30:20-21.)  Then Strong – getting "into more of the details" – clarified that there actually were <u>three</u> complaints of retaliation (Doc. 46, Strong Dep., pp. 93-95, 81, 82, 84, 104), as were then described in CMC's Summary Judgment Brief (Doc. 43-2, p. 9).  Of course, none of McDonald's invented inconsistencies discredit anything about CMC's honest belief that McDonald was insubordinate and needed to be terminated, and even if any such inconsistency were true (*which CMC denies*), such "minor inconsistency would not permit a reasonable jury to conclude that [CMC]'s proffered reason was pretext." *McCrea v. Traffic Control Prods. of Fla.*, No. 2:12-cv-557-FtM-29CM, 2014 U.S. Dist. LEXIS 114573, at *14 (M.D. Fla. Aug. 18, 2014).

Finally, McDonald attempts to muddy the water by claiming inconsistencies with CMC's "progressive discipline policy."  (Doc. 50, p. 11.)  CMC did <u>not</u> have a "progressive discipline policy."  (Doc. 47-6, p. 1.)  It had a *nonmandatory* "Discipline, Counseling, Corrective Action Policy," but that policy was intended only "[t]o provide guidelines to assist managers in administering employee discipline." (*Id*.) The policy did <u>not</u> establish "requirements," but simply listed various disciplinary tools that could be used at the discretion of a manager.  (*Id*.)  Further,

the policy provided, "An employee may be immediately discharged for a single <u>serious offense</u> without a previous disciplinary action recorded." (*Id*. at 2 (emphasis added).)  A "Serious Offense" is defined to include "<u>insubordination</u>." (*Id*.)  Thus, "[w]hile [McDonald] is correct that in some circumstances, an employer's failure to follow its own policies may be evidence of pretext, the evidence here does not establish [that CMC] deviated from its disciplinary policy.  [McDonald] was terminated for insubordination, and [CMC]'s policy clearly provides that insubordination" is a serious offense that may result in immediate termination.  *See Thompson v. Tyson Foods, Inc.*, 939 F. Supp.2d 1356, 1369-70 (M.D. Ga. 2013).

There are no "implausibilities, inconsistencies, incoherencies, or contradictions" in CMC's reasons to terminate McDonald.  *Resler,* 2014 U.S. Dist. LEXIS 40701, at *14.  Indeed, McDonald has presented no evidence that CMC's reasons were pretext, much less "by a preponderance of evidence." *Story*, 120 F. Supp. 2d 1027, 1040 (M.D. Fla. 2000).  Accordingly, CMC is entitled to summary judgment.

### B. **McDonald's ADA Accommodation and Discrimination Claims and Her FMLA Interference Claim Fail.**

McDonald claims, with minimal support – either legal or factual, that she had a qualifying disability under the ADA.[5]  (Doc. 50, pp. 14-16.)  She claims she has seen "several doctors" since 2016 (*id*., p. 16), but beyond her self-serving declaration, McDonald identified only a single medical record from November 9, 2021, to support her claim. (Doc. 50-2, McDonald's Statement of Facts, ¶ 88 (citing Doc. 45-37)).  Further, contrary to her new declaration, McDonald was adamant during her deposition that her condition did not prevent her from working or otherwise limit her physical abilities.  (Doc. 45, McDonald Dep., pp. 88-89.)  She testified that she regularly

---

[5] Notably, McDonald completely ignores CMC's argument (*see* Doc. 43-2, CMC's MSJ, p.2) that her failure to show her alleged disability was the *but-for* cause of her termination is sufficient grounds to deny her ADA claim.  For this reason alone, summary judgment is warranted on her ADA discrimination claim.

worked 10-11 hours a day, commuted 70 miles to work on a regular basis, and did not require any medical leave until her surgery. (*Id*., pp. 85-88.)[6] Thus, the record does not support a finding that McDonald had a qualifying disability.

Finally, even if McDonald had a qualifying disability, she still has not established that she was denied a requested accommodation in violation of the ADA or unlawfully denied FMLA leave. McDonald posits her FMLA leave request as a request for accommodation under the ADA and then claims that, even though it was granted, it was constructively denied because she was terminated before it began. (Doc. 50, p. 17.) McDonald's circular logic fails for two reasons. First, CMC granted her FMLA leave, and thus, there is no "specific instance in which she needed an accommodation and was denied one." *Gaston v. Bellingrath Gardens & Home,* 167 F.3d 1361, 1327 (11th Cir. 1999). Second, the mere fact that an employee has been granted leave does not immunize her from the consequences of her own actions. *See McAlpin v. Town of Sneads*, 61 F.4th 916, 927-28 (11th Cir. 2023) ("[E]mployer may defend against FMLA interference claim by [showing] the employee would have been terminated anyway."). As discussed *supra* in relation to her retaliation claims, McDonald was terminated for legitimate, well supported reasons prior to her approved FMLA leave commencing, and she has cast no doubt on CMC's reasons for her termination. As a result, her ADA accommodation and FMLA interference claims must fail. *See Butler v. Advance/Newhouse P'ship*, No. 6:11-cv-1958, 2013 U.S. Dist. LEXIS 42321, at *11-12 (M.D. Fla. Mar. 26, 2013) (FMLA Interference claim fails if employee would have been terminated anyway).

---

[6] McDonald cannot create an issue of fact with a sham affidavit. An affidavit is a "sham" "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986). Thus, McDonald's clear unambiguous deposition testimony controls, and to the extend her new declaration contradicts her prior testimony, it should be stricken.

**C.      McDonald's Retaliation Claims Fall Flat on Legal and Factual Grounds.**

McDonald agrees the proper framework for analyzing her retaliation claim premised on CMC's dismissed counterclaim is whether the counterclaim was based in law or fact. (Doc. 50, p. 17.) She then proceeds, however, to make nonsensical arguments devoid of reason or legal support. *First*, McDonald states, without explanation or support, that her insubordination did not qualify as "gross negligence or willful misconduct." (*Id*.) It is difficult to understand how insubordination, defined as "refusing to obey orders from people in authority," does not qualify as "willful misconduct." CAMBRIDGE DICTIONARY, Insubordination, https://dictionary.cambridge.org/us/dictionary/english/insubordination (accessed Sep. 22, 2023). *Next*, McDonald makes an equally illogical argument by referencing CMC's "Severance Policy," which states that severance is not provided to an employee "terminated for cause" – but, that policy clearly pertains only to circumstances involving "reductions in force, downsizing, or reorganization," not to the termination of an employee for misconduct, like McDonald. (*See* Doc. 47-5.) Moreover, even if CMC ignored its own policy to offer McDonald a valuable severance package, it is difficult to understand how that decision proves CMC later retaliated against her by seeking to enforce the unrelated Retention Bonus Agreement.

*Third*, McDonald misstates the record and claims CMC had "no intention" to require McDonald to repay the retention bonus before she filed suit. (Doc. 50, p. 18.) The record shows that the retention bonus was part of ongoing negotiations between CMC and McDonald after her separation. (Doc. 45, McDonald Dep., pp. 75-76.) The negotiations fell apart because McDonald rejected CMC's proposal and demanded more severance. (*Id*. at 77.) In other words, CMC was willing to waive the repayment requirement if it reached an amicable resolution with McDonald. When no resolution was reached, CMC proceeded to enforce the agreement.

*Fourth*, without legal analysis or support, McDonald rhetorically ponders if CMC had standing to bring the claim, since the Retention Bonus Agreement was between McDonald and Piedmont, not CMC. (Doc. 50, p. 18.) McDonald's failure to engage with this analysis is reason enough to ignore it, but just to be clear, in 2022, Piedmont executed a written assignment of its contractual rights to CMC, and that assignment was produced to McDonald early in discovery. Furthermore, even if the assignment had not been executed, CMC – where McDonald was to remain employed – clearly was a third-party beneficiary to the Agreement and entitled to enforce it. *See* O.C.G.A. § 9-2-20 ("The beneficiary of a contract … between other parties for his benefit may maintain an action against … promisor on the contract."); *Clower v. Orthalliance, Inc.*, 337 F. Supp. 2d 1322, 1337 n.10 (N.D. Ga. 2004) (finding employer a third-party beneficiary where "both parties understood [plaintiff] was promising to enter into an employment agreement with [employer], and [contracting party]'s promise was for the benefit of [employer.]").

*Finally*, McDonald asks this Court to draw improper inferences from CMC's decision to voluntarily dismiss the counterclaim. (Doc. 50, p. 18.) But, as set forth in CMC's brief, both the law and facts support its claim, and its decision to voluntarily dismiss does not change the valid basis of its claim. *See Smith v. Miami-Dade Cty.*, 621 F. App'x 955, 960 (11th Cir. 2015) (whether a counterclaim "will ultimately lose on the merits is different than [whether it] had no reasonable basis in fact or law to file a counterclaim in the first place.") Accordingly, CMC is entitled to summary judgment on McDonald's retaliation claim premised on its dismissed counterclaim.

### III. CONCLUSION

CMC respectfully requests that the Court grant summary judgment in its favor and dismiss McDonald's claims in their entirety.

Respectfully submitted this 22nd day of September 2023.

                        HALL, GILLIGAN, ROBERTS
                        & SHANLEVER LLP

                        */s/ Matthew J. Gilligan*
                        Matthew J. Gilligan
                        Georgia Bar No. 294955
                        mgilligan@hgrslaw.com
                        Wayne M. Cartwright
                        Georgia Bar No. 257328
                        wcartwright@hagrslaw.com
                        3340 Peachtree Road, NE – Suite 1900
                        Atlanta, Georgia 30326
                        Phone: (404) 442-8776
                        Fax: (404) 442-8775

                        *Attorneys for Defendant CMC*