**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

|  |  |  |
|---|---|---|
| **SHARON MCDONALD,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:22-CV-280 (MTT)** |
| | ) | |
| **COLISEUM MEDICAL CENTER** | ) | |
| **LLC d/b/a PIEDMONT MACON** | ) | |
| **MEDICAL CENTER** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

Defendant Coliseum Medical Center LLC ("CMC") d/b/a Piedmont Macon Medical Center ("Piedmont") moves for summary judgment on plaintiff Sharon McDonald's claims under the Family and Medical Leave Act of 1993 ("FMLA") and Americans with Disabilities Act ("ADA"). Doc. 43. For the reasons that follow, Piedmont's motion (Doc. 43) is **GRANTED.**

## I. BACKGROUND

### A. Piedmont's Acquisition of CMC in July 2021

In September 2020, McDonald was hired by CMC as the Director of General Medical-Surgical and Oncology. Docs. 43-1 ¶ 6; 45 at 10:22-25; 50-1 ¶ 6; 50-3 ¶ 16. On July 31, 2021, Piedmont acquired CMC. Docs. 43-1 ¶ 3; 50-1 ¶ 3.

In early July 2021, Stephen Daugherty, the Chief Executive Officer of CMC (and later Piedmont) offered McDonald and others a retention bonus as an incentive to remain with Piedmont after the acquisition. Docs. 43-1 ¶¶ 5, 10-11; 50-1 ¶¶ 5, 10-11.

The retention bonus agreement provided that if McDonald remained employed with Piedmont until July 31, 2022 ("the retention period") she would receive $7,500 within 14 days of signing the agreement and $7,500 after the retention period concluded.  Docs. 43-1 ¶¶ 11-12; 45-4; 50-1 ¶¶ 11-12.  However, if McDonald was terminated "for cause" during the retention period, she would be obligated to repay the bonus.  Docs. 43-1 ¶¶ 11-12; 45-4; 50-1 ¶¶ 11-12.  McDonald signed the retention bonus agreement on July 15, 2021, and received the first installment of $7,500 in early August 2021.  Docs. 43-1 ¶ 153; 45-4 at 3; 50-1 ¶ 153.

On July 29, 2021, McDonald received a performance review from David Threatt, her supervisor before Piedmont acquired CMC.  Docs. 47-2 at 1, 5; 50-2 ¶ 29; 53 ¶ 29. Threatt stated that overall McDonald's performance "exceed[ed] expectations" for the review period of January 1, 2020 to December 31, 2020.  Docs. 47-2 at 1, 5; 50-2 ¶ 29; 53 ¶ 29.

**B. McDonald's Performance in September and October of 2021**

After the acquisition, McDonald reported to Denise Ray, the Chief Nurse Executive, and Scott Strong, the Chief Operating Officer.  Docs. 43-1 ¶¶ 18, 20, 22; 45-4; 50-1 ¶¶ 18, 20, 22.  CNE Ray and COO Strong both testified that by early September 2021, it became apparent "that McDonald was deficient in many of her management skills and overall job performance."[1]  Docs. 43-1 ¶ 28; 43-3 ¶ 9; 43-4 ¶ 9; 50-1 ¶ 28. Piedmont cites four overarching problems as evidence of McDonald's poor performance: attendance at mandatory meetings; complaints from subordinates and

---

[1] McDonald denies that she was deficient in her management skills and job performance.  Doc. 50-1 ¶ 28.

peers; poor performance on quality inspection reports; and failure to monitor her units and help shoulder the high workload.

### 1. Attendance at Mandatory Meetings

Piedmont contends that McDonald consistently failed to attend or was tardy for mandatory management meetings.  Docs. 43-1 ¶ 29; 50-1 ¶ 29.  Specifically, McDonald did not attend a September 8, 2021 "Procedure Startup Huddle" meeting; she was late to an October 12, 2021 Multidisciplinary Rounds ("MDR") meeting; and she was late to an October 25, 2021 MDR meeting.  Docs. 43-1 ¶ 32; 45-20; 45-27; 45-28; 50-1 ¶ 32.  McDonald does not deny that she was absent or late to these meetings, but she claims her absence or tardiness was justified or excused.  Doc. 50-1 ¶ 32.  Regarding the September 8, 2021 meeting, McDonald contends that her absence was "accepted" because she sent Abi Millwood, a senior manager, to the meeting in her place, which was "common practice" at the time.  Doc. 50-1 ¶¶ 31, 33.  Regarding the October MDR meetings, McDonald argues that she was late "because she was performing other job duties … due to short staffing."  *Id*. ¶ 58.

### 2. Complaints from McDonald's Subordinates and Peers

In mid-September 2021, Carson Fay, a registered nurse in McDonald's department, complained to COO Strong about McDonald's leadership and management, "including lack of engagement, a lack of communication, a lack of leadership, and a lack of visibility."  Docs. 43-1 ¶ 40; 43-3 ¶ 18; 50-1 ¶ 40.  After meeting with Fay, COO Strong's "impression was that McDonald was not a strong or effective leader or manager, and that she was not adequately communicating with or supporting her staff."  Doc. 43-3 ¶ 19.  McDonald contends that COO Strong's testimony

is not credible because she "had a great working relationship with Fay," and Fay never confronted McDonald with concerns about her performance.  Doc. 50-3 ¶ 61.

Abi Millwood, a senior manager McDonald supervised, also discussed several "concerns" with CNE Ray and COO Strong in September 2021.  Docs. 43-1 ¶¶ 44-45; 43-3 ¶ 22; 43-4 ¶ 19; 50-1 ¶¶ 44-45.  COO Strong and CNE Ray testified that Millwood complained about McDonald's leadership; CNE Ray then discussed Millwood's concerns with McDonald; and in response, McDonald retaliated against Milwood for her complaints.  Docs. 43-3 ¶¶ 22-26; 43-4 ¶¶ 19-21.  During her deposition, McDonald acknowledged that Millwood complained to CNE Ray "about [her] leadership and management style."  Doc. 45 at 45:24-46:4 (Q: "Well, how did you find out that Abi Millwood had concerns about your leadership and management style?" A: "When I called Denise [Ray] to share my concerns with her, she shared *those* concerns.") (emphasis added)).  But McDonald denies that she retaliated against Millwood.  Rather, McDonald argues she contacted Millwood to discuss Millwood's complaints and Millwood told McDonald that "her complaints were misinterpreted" and had nothing to do with McDonald.  Doc. 50-3 ¶¶ 48-49.  After McDonald and Millwood talked, Millwood sent COO Strong an email stating:

> When I spoke with [McDonald], she asked me about the call. I gave her a quick run-down. She then made accusations that her staff members told her that I stated that she "was never here and did not help" and that I couldn't help because I was "forced" to work nights.  I denied the allegations because they were not true.… I offered to have a conversation between the three of us because you were present and knew for sure that I did not publicly disrespect her, as she stated that I did.  She declined the need for that conversation but wanted my take. She reminded me that there are three sides to every story and doesn't believe them until she's heard them all.  I do have concerns about her having trust and confidence in me moving forward.

Doc. 43-3 at 12.

During the week of October 25, 2021, Nora Gibson and Britt Wilson complained to COO Strong about McDonald's behavior.  Docs. 43-1 ¶¶ 78, 80; 43-3 ¶¶ 37-38; 50-1 ¶¶ 78, 80.  Both claimed that McDonald had confronted them for allegedly "tattling" to COO Strong.  Docs. 43-1 ¶¶ 78, 80; 43-3 ¶¶ 37-38; 50-1 ¶¶ 78, 80.  Gibson and Wilson told COO Strong that they thought McDonald's conduct created a "hostile work environment."  Doc. 43-3 ¶¶ 37-38.  McDonald denies that she ever "confronted and retaliated against" Gibson or Wilson.  Doc. 50-3 ¶¶ 60, 75.

### 3. Quality Inspection Reports

"In early October 2021, three separate quality inspections of McDonald's areas of responsibility" revealed "performance deficiencies and patient safety concerns."  Docs. 43-1 ¶ 57; 50-1 ¶ 57.  For example, a quality inspection conducted on October 11, 2021 noted multiple problems in McDonald's unit including, "[v]ital sign machine … blocking a fire compartment door in the hallway," "[t]wo bags of potassium unsecured on WOW 1," "bottles of glucose strips found undated and in use in the hallway on WOWs," "[e]xpired culture swab unlabeled pill splitter on WOW in use," "multiple expired blood / lab tubes - mainly purple and pink - room behind nurses station," "[e]xpired culture vial - room behind nurses station," "[o]pen electrodes on WOW - not sealed / protected to keep fresh," "[m]ultiple WOWs and vital sign machines in hallway - a few did not move over the course of almost 30 minutes."  Doc. 45-25 at 1.  McDonald does not deny that these quality inspection reports revealed problems but contends that these problems were not unique to her unit.  Doc. 50-3 ¶ 70 ("From my own personal knowledge in reviewing the surveys of other directors and comparing them to my own, none of the issues labeled on my survey was different from the issues listed on other director's surveys.").

*4. Presence and Workload*

COO Strong testified that he "frequently received feedback from McDonald's peers and subordinate supervisors, indicating that McDonald was 'not on her unit' doing her work as a Director, or that McDonald would 'disappear from the workplace' or 'shut herself in her office' while others were managing heavy workloads." Docs. 43-1 ¶ 64; 43-3 ¶ 32; 50-1 ¶ 64. Consequently, COO Strong "inquired with McDonald," and she stated that she was "on the floor doing her work." Docs. 43-1 ¶ 65; 43-3 ¶ 33; 50-1 ¶ 65. COO Strong doubted "McDonald was telling him the truth." Docs. 43-1 ¶ 66; 43-3 ¶ 33; 50-1 ¶ 66.

As a result, COO Strong confronted McDonald specifically about her activities on October 1, 2021 "after receiving complaints from her peers." Docs. 43-1 ¶ 67; 43-3 ¶ 33; 50-1 ¶ 67. "McDonald claimed that she had been 'on the floor all day passing medications and charting.'" Docs. 43-1 ¶ 67; 43-3 ¶ 33; 50-1 ¶ 67. COO Strong then conducted "an audit of McDonald's work activities" for October 1, 2021, which "revealed that McDonald had lied" to him and "she essentially had done none of the work she claimed to have done." Docs. 43-1 ¶ 68; 43-3 ¶ 33; 50-1 ¶ 68. McDonald does not dispute that the audit accurately depicts her activities on October 1, 2021. Doc. 50-3 ¶ 59. Instead, McDonald claims she "never told" COO Strong that she "had been 'on the floor all day passing medications and charting.'" Doc. 50-3 ¶ 59. She does not say what she was doing.

COO Strong and CNE Ray testified that they repeatedly coached McDonald throughout this period on how to improve her performance, "including coaching her to be present on her unit, to be present at change of shift, to step in and take care of

patients, and to communicate effectively with her subordinates."  Docs. 43-1 ¶¶ 34, 39, 69-70; 43-3 ¶¶ 13, 17, 34; 43-4 ¶¶ 13, 16, 17, 25; 50-1 ¶¶ 34, 39, 69-70.  But it became clear to COO Strong and CNE Ray that McDonald was "incapable of improving to the level [they] expected, or she was not willing to put in the effort required to get to that level."  Docs. 43-1 ¶¶ 69-70; 43-3 ¶ 34; 43-4 ¶¶ 25; 50-1 ¶¶ 69-70.  McDonald denies that she was ever "counseled and/or coached," and contends she never "received any formal or informal disciplinary action or performance related warnings."  Doc. 50-3 ¶¶ 41-45.

**C. McDonald's Request for FMLA Leave**

In 2016, McDonald was diagnosed with cervical stenosis, "a condition in which bone spurs form around [the] spinal canal placing pressure on [the] spinal cord and nerves."  Docs. 50-2 ¶¶ 88-89; 53 ¶¶ 88-89.  McDonald testified that the "excruciating pain" caused by her cervical stenosis prevented her from sleeping, affected her appetite and ability to prepare meals, made it difficult to sit or stand for more than 15-20 minutes, made it difficult to drive, and inhibited her ability to bathe, dress, or tie her shoes without assistance.  Docs. 50-2 ¶¶ 92-94; 53 ¶¶ 92-94.  Notwithstanding her pain, McDonald testified that her cervical stenosis did not prevent her from working.  Doc. 45 at 85:23-86:1, 89:14-23.

In July 2021, McDonald's "condition significantly worsened" and her doctors recommended surgery to help with the pain.  Docs. 43-1 ¶ 91; 50-1 ¶ 91; 50-2 ¶ 91; 53 ¶ 91.  "McDonald's doctor informed her that, after her surgery, she would need to be on leave from work … for approximately 12 weeks."  Docs. 50-2 ¶ 92; 53 ¶ 92.  On October 7, 2021, McDonald applied for FMLA leave.  Docs. 43-1 ¶ 95; 50-1 ¶ 95.  COO Strong

was aware McDonald applied for FMLA leave no later than October 29, 2021.[2]  Doc. 53

¶ 1.  McDonald was approved for FMLA leave on November 2, 2021.  Doc. 45-31.

### D. McDonald's Insubordination and Eventual Termination

*1. Failure to Attend Sunday Morning Change-of-Shift Meeting*

"During the week of October 25-29, 2021, CMC leadership determined that,

because of recent staff resignations and a surging patient population, it was likely that

the hospital would be 'extremely short-staffed' on the weekend of October 30-31, 2021,

and that various departments would have difficulty covering their respective areas."

Docs. 43-1 ¶ 102; 50-1 ¶ 102.

COO Strong testified that "to address the looming staffing crisis, all critical

department directors (including the two Medical-Surgical directors [McDonald and Vicky

Allen]) would need to be at the hospital during the Sunday morning, October 31, 7:30

a.m. change-of-shift in order to support their departments' staffs and to coordinate with

other department leaders to make adjustments and cover all critical areas."[3]  Doc. 43-3

¶ 48.  The Friday before the weekend shift began, COO Strong "instructed McDonald

that she and other directors needed to be present for the change-of-shift on Sunday

morning, October 31."  *Id*. ¶ 52.  In response, "McDonald proposed that she just send a

subordinate manager to cover the Sunday morning change-of-shift."  *Id*. ¶ 54.  But COO

Strong "specifically rejected that proposal and insisted that McDonald herself needed to

be present."  *Id*.  "Later that Friday evening in a phone call with McDonald, [COO

---

[2] McDonald testified that she "told Strong on October 6, 2021 that she was planning to apply for FMLA leave to cover her neck surgery and recovery period."  Docs. 50-1 ¶ 98; 50-3 ¶ 81.  COO Strong testified that he was not aware McDonald applied for FMLA leave until "the end of October."  Docs. 43-1 ¶ 98; 43-3 ¶ 42.

[3] McDonald testified that the change-of-shift meeting was at 7:00 a.m.  Docs. 50-3 ¶ 90; 50-2 ¶ 75.

Strong] again reminded McDonald that she needed to be present on Sunday morning."
*Id*. ¶ 55.  COO Strong informed CEO Daugherty, the administrator on call that Sunday, that McDonald would be present for the morning change-of-shift.  Docs. 43-1 ¶ 113; 43-3 ¶ 56; 50-1 ¶ 113.

McDonald was not present during the Sunday morning change-of-shift meeting.
Docs. 43-1 ¶ 114; 50-1 ¶ 114.  CEO Daugherty contacted COO Strong "to report that the transition of hospital staff at shift change was a 'disaster.'"  Docs. 43-1 ¶ 117; 50-1 ¶ 117.  CEO Daugherty sent COO Strong and CNE Ray a text message stating:

> Sharon's floors are falling apart.  Scott [Strong] specifically told her to be here at shift change this am.  She is not here and reported to Nurse supervisor she will be here in 2 hours.  I am really I've Rhee [*sic*] lack of leadership.

Docs. 43-1 ¶ 118; 43-3 at 23-24; 50-1 ¶ 118.  CNE Ray responded:

> This should be a write-up and possibly a termination offense if she was told to be there at the beginning of her shift or at least a written warning.

Docs. 43-1 ¶ 118; 43-3 at 23-24; 50-1 ¶ 118.

During a November 1, 2021, recorded telephone conference convened by COO Strong to discuss the events of October 31, 2021, McDonald stated that it "was not clear" that COO Strong had instructed her to be present for the Sunday morning change-of-shift.  Doc. 43-6 at 8.  In her deposition, McDonald testified that she told COO Strong her plan to have her subordinate, Norma Atterbury, cover the Sunday morning change-of-shift and COO Strong responded: "As long as you've got it covered." Doc. 45 at 169:7-20.

### 2. Contradicting the House Supervisor

"On the morning of October 31, 2021, Registered Nurse Lindsey ('Britt') Wilson was the weekend 'House Supervisor.'"  Docs. 43-1 ¶ 119; 50-1 ¶ 119.  "The House

Supervisor is the senior nurse on site, who has the authority over all staffing decisions when the hospital is outside of its normal hospital working hours."  Docs. 43-1 ¶ 120; 50-1 ¶ 120.  Questioning the decisions of the House Supervisor is inappropriate because the House Supervisor is the "right hand to the administrative team" and ensures the CEO "always has information to understand the decisions" and events "happening within the hospital."  Docs. 43-1 ¶ 121, 122; 46 at 18:17-24; 50-1 ¶ 121, 122.

On October 31, 2021, House Supervisor Wilson contacted COO Strong and CEO Daugherty "to complain about an incident that occurred earlier that morning, whereby McDonald had intervened in a staffing decision that had been made by Wilson, and McDonald had gone against what was decided."  Docs. 43-1 ¶ 123; 43-3 ¶ 64; 50-1 ¶ 123.  At COO Strong's request, House Supervisor Wilson provided a written statement about the incident.  Docs. 43-1 ¶ 124; 43-3 ¶ 65; 50-1 ¶ 124.  The statement explained that House Supervisor Wilson instructed Claire, who was working on "5 west" as a "tech," to go to "3 east" to help with nursing duties.  Doc. 43-3 at 26.  Then McDonald called Wilson and stated that Claire would be "staying on 5 west as a tech" and Wilson "needed to float a nurse from 5 east to 3 east."  *Id*.  Wilson disagreed with the decision. *Id*. ("Floating a nurse from 5 east would put the floor at a 7:1 ratio with a census of 28," which "[d]idn't make any sense.").

During the November 1, 2021 recorded telephone conference, McDonald stated that she "proposed" Claire stay on 5 west because McDonald's subordinates agreed "amongst themselves" to this arrangement.  Doc. 43-6 at 7 ("This was their decision not mine.").  By affidavit, McDonald disputes Wilson's account of what happened.  She

claims, Wilson contacted *her* "to get [her] suggestions about how to handle staffing." Docs. 50-2 ¶ 64; 50-3 ¶ 94; 53 ¶ 64.  McDonald acknowledges that she told House Supervisor Wilson "that given the circumstances and the lack of coverage on [5 west] it would make more sense to keep the RNs there," but she claims Wilson "agreed with [her] proposal, and that was the end of [their] conversation."  Docs. 50-2 ¶ 65; 50-3 ¶ 94; 53 ¶ 65.

    *3. Administrative Leave and Termination*

On October 31, 2021, COO Strong placed McDonald "on administrative leave pending an investigation of the circumstances."  Docs. 43-1 ¶ 126; 50-1 ¶ 126.  During the November 1, 2021, telephone conference COO Strong explained that he placed McDonald on administrative leave because she was not present during the Sunday morning change-of-shift and contradicted House Supervisor Wilson's orders.  Docs. 43-1 ¶ 126; 43-6 at 6; 50-1 ¶ 126.  "On or about November 2 or 3, 2021," COO Strong "made the final decision to terminate McDonald's employment … based not only on the two acts of insubordination, but also on McDonald's overall poor leadership, poor work performance, and lack of improvement despite significant coaching and multiple opportunities to improve."  Docs. 43-1 ¶ 146; 43-3 ¶ 78; 50-1 ¶ 146.

"On Thursday, November 4, COO Strong convened a telephone conference with McDonald, CNE Ray, and HR Director [Angie] Walker to inform McDonald that she would be terminated."  Docs. 43-1 ¶ 147; 50-1 ¶ 147.  During this recorded meeting, COO Strong stated that he decided to terminate McDonald because his "directions [were] not followed" and he did not "have the confidence" that McDonald would help "lead [the] nursing teams in the right direction under Piedmont's values and

expectations."  Doc. 43-6 at 12.  HR Director Walker reiterated that "the primary reason"

for terminating McDonald, was the lack of "confidence" in McDonald's ability to lead the

nursing team.  *Id*. at 14.  At the end of the meeting, "McDonald inquired whether she

would be required to pay back the initial installment of the Retention Bonus she

received in August 2021, and HR Director Walker stated that she would not."  Docs. 43-

1 ¶ 152; 50-1 ¶ 152.

### E. Procedural History

On July 13, 2022, McDonald sued Piedmont claiming that her termination

violated the FMLA and ADA.  Doc. 1.  In response, Piedmont brought a counterclaim for

breach of contract based on McDonald's failure to repay the retention bonus.  Doc. 10

¶¶ 60-78.  McDonald filed an amended complaint to add a retaliatory litigation claim,

alleging that Piedmont's counterclaim was in retaliation for McDonald's discrimination

lawsuit.  Doc. 31 ¶¶ 18-40.[4]  On June 2, 2023, Piedmont moved to voluntarily dismiss

the breach of contract counterclaim without prejudice.  Doc. 40.  The Court granted that

motion.  Doc. 42.  Piedmont now moves for summary judgment on all of McDonald's

claims.  Doc. 43.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on

the evidence presented, "a reasonable jury could return a verdict for the nonmoving

---

[4] At first, McDonald inadvertently alleged a "Title VII" retaliatory litigation claim when she intended to allege a retaliatory litigation claim under the FMLA and ADA.  Docs. 17 ¶¶ 64-71; 21 at 2.  McDonald subsequently moved to amend her complaint to correct this error, which the Court granted.  Docs. 21; 30; 37.

party." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (quoting *Celotex*, 477 U.S. at 324) (alterations in original).  Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court

may consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2).

However, "[c]redibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge. … The

evidence of the non-movant is to be believed, and all justifiable inferences are to be

drawn in [her] favor."  *Anderson*, 477 U.S. at 255.

### III.  DISCUSSION

### A. FMLA and ADA Retaliation Claims

McDonald claims Piedmont fired her in retaliation for her FMLA leave request in

violation of the FMLA and ADA.  Doc. 31 ¶¶ 41-50, 66-79.  The FMLA and the ADA

prohibit "an employer from retaliating against its employee for engaging in activities

protected" by the statute.  *Batson v. Salvation Army*, 897 F.3d 1320, 1328 (11th Cir.

2018) (citing 29 U.S.C. § 2615(a)(1)-(2)); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570

U.S. 338, 357 (2013).  To succeed on a retaliation claim, an employee must present

either direct or circumstantial evidence of retaliatory intent.  "Direct evidence is

'evidence, which if believed, proves existence of fact in issue without inference or

presumption.'"  *Burrell v. Bd. of Trustees of Ga. Mil. Coll.*, 125 F.3d 1390, 1393 (11th

Cir. 1997) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir.

1987)); *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1270 (11th Cir.

2017).  In the absence of direct evidence, a plaintiff can rely on either the *McDonnell*

*Douglas* burden-shifting framework or present a convincing mosaic of circumstantial

evidence sufficient to create a triable issue of fact as to whether the defendant acted

with retaliatory intent.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Berry*

*v. Crestwood Healthcare LP*, 84 F.4th 1300, 1304 (11th Cir. 2023).  Regardless of the

specific framework, the question ultimately is "whether the evidence permits a reasonable factfinder to find that the employer retaliated against the employee." *Berry*, 84 F.4th at 1304.  McDonald relies on circumstantial evidence to demonstrate retaliatory intent.  Docs. 50; 55.

### 1. *McDonnell Douglas*

Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of retaliation.  411 U.S. at 802.  If a plaintiff establishes a prima facie case of retaliation, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nonretaliatory reason for the employment action.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981).  This burden of production means the employer "need not persuade the court that it was actually motivated by the proffered reasons," but must produce evidence sufficient to "raise[] a genuine issue of fact as to whether it [retaliated] against the plaintiff."  *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

A plaintiff must then show that the employer's stated reason is in fact pretext for retaliation.  *Kragor*, 702 F.3d at 1308.  This may be done "either directly by persuading the court that a [retaliatory] reason more likely motivated the employer *or* indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id*. at 1308-09. (emphasis added). Ultimately, the burden of persuasion rests with the plaintiff who must show that the proffered reasons for the employment action were pretextual—

thereby permitting, but not compelling, the trier of fact to conclude that the employment

action at issue was the product of impermissible retaliation.[5]

---

[5] It is commonly said that a plaintiff responding to an employer's motion for summary judgment must prove that the employer's legitimate, nondiscriminatory reasons ("LNRs") are "false, *and that* discrimination was the real reason" for the employer's action. *Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)); *see, e.g., Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1352 (11th Cir. 2022); *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1298 (11th Cir. 2021); *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018); *Brooks v. Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006). Taken literally, as defendants aggressively argue we should, this characterization suggests that to survive summary judgment the plaintiff must adduce direct evidence that an employer acted with discriminatory animus. That can't be right. *McDonnell Douglas* is all about proving intentional discrimination by circumstantial evidence; if an employee had direct evidence that the real reason for the adverse employment action was discrimination, the employee would have no need to resort to *McDonnell Douglas*. This characterization, purportedly based on *St. Mary's*, sounds a lot like the discredited "pretext plus" analysis. 509 U.S. at 515. A brief review of the relevant Supreme Court precedent illustrates this point.

First, *St. Mary's* was not a summary judgment case. *Id.* at 505. Rather at a *bench trial*, the plaintiff established that the employer's LNRs were false, but the fact finder nevertheless concluded that the plaintiff had not met his *trial* burden of proving that the employer had engaged in intentional discrimination. *Id.* at 508. The Eighth Circuit reversed, holding that the plaintiff, having proved the LNRs false, was entitled to judgment as a matter of law. *Id.* at 508-09. The Supreme Court granted certiorari to determine whether "the trier of fact's rejection of the employer's asserted reasons for its actions mandates a finding for the plaintiff." *Id.* at 504. The Court held that simply proving pretext, meaning that the plaintiff had successfully navigated *McDonnell Douglas*, did not entitle the plaintiff to judgment as a matter of law. *Id.* at 511. Rather, "rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, '[n]o additional proof of discrimination is *required*.'" *Id.* (footnote omitted). In short, nothing the Court said in *St. Mary's* suggests that to survive *summary judgment*, a plaintiff must necessarily prove pretext and that discrimination was the real reason for the employer's action.

True, the Supreme Court stated that "a reason cannot be proved to be a 'pretext for *discrimination*, unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Id.* at 515. But the context of that statement is critical—the Supreme Court's point was that to prevail at trial the plaintiff must convince the fact finder that discrimination was the real reason for the adverse action. Nevertheless, this language led some courts to require plaintiffs to prove pretext and to proffer additional evidence of discrimination to survive summary judgment. *See Reeves v. Sanderson Plumbing Products., Inc.*, 530 U.S. 133, 140-41 (2000) (collecting cases). This came to be called pretext plus.

In *Reeves*, the Supreme Court emphatically rejected pretext plus. *Id.* at 147. While the plaintiff must ultimately prove intentional discrimination, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* As a result, a plaintiff is not necessarily required to provide more than discrediting evidence alone to demonstrate discrimination. *Id.* at 146 (emphasis added) ("[T]he Court of Appeals proceeded from the assumption that a prima facie case of discrimination, combined with sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, nondiscriminatory reason for its decision, is insufficient as a *matter of law* to sustain a jury's finding of intentional discrimination. In so reasoning, the Court of Appeals misconceived the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination through indirect evidence."). On the other hand, *Reeves* makes clear that proving the defendant's LNRs false did not necessarily mean the plaintiff would get to a jury. *Id.* at 148 ("For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was

To establish a prima facie case of retaliation "a plaintiff must show that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse employment action."  *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 798 (11th Cir. 2000).  It is undisputed that McDonald engaged in statutorily protected conduct when she requested, and was promptly granted, FMLA leave, and that McDonald's termination is an adverse employment action.  Doc. 43-2 at 4.  As for the causation element of the prima facie case, McDonald contends that the temporal proximity between her FMLA leave request and her termination (approximately two days) is sufficient.  Doc. 50 at 4 n.1.  Piedmont strongly disputes that McDonald can establish a causal connection by simply pointing to the temporal proximity between her discharge and her FMLA leave request.  Docs. 43-2 at 4-7.  And even if McDonald could rely on temporal proximity, Piedmont argues the two acts of insubordination sever any causal connection.  *Id*.  The Court agrees, though for a slightly different reason, that McDonald has not demonstrated a causal connection sufficient to establish a prima

---

untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").  The ultimate inquiry is whether the evidence is sufficient to allow a reasonable jury to find that the reason for an adverse employment action was illegal discrimination.  The *McDonnell Douglas* framework "can help answer that question—but it cannot replace it."  *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 942 (11th Cir. 2023); *see also* Judge Newsom's persuasive concurrence in *Tynes*, 88 F.4th at 949-958.

Clearly, at the summary judgment stage, the plaintiff, in rebutting the employer's proffered LNRs, does not *necessarily* shoulder the burden of establishing falsity and that the real reason was discrimination.  Certainly, the plaintiff is not required to adduce direct evidence of intentional discrimination.  Rather, as the Eleventh Circuit has recently made clear, a prima facie case plus the falsity of the defendant's LNRs "*may* be enough to send the issue to a jury."  *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1326-27 (11th Cir. 2023) (emphasis added).  As the Supreme Court said in *St. Mary's*, "[n]o additional proof of discrimination is *required*."  509 U.S. at 511.

This case illustrates the point.  If McDonald had established a prima facie case and shown that all Piedmont's LNRs were false, she *may* have successfully navigated *McDonnell Douglas*.  But, as discussed below, on this record the Court concludes that no reasonable jury could find that her granted request for FMLA leave played any role in her termination.

facie case between her discharge and her approved FMLA leave request.  But the Court

defers that discussion for a moment and proceeds to Piedmont's alleged legitimate

nonretaliatory reasons for terminating McDonald.

Piedmont contends it terminated McDonald because: she was consistently

"absent from or late to mandatory management meetings"; COO Strong received

multiple "'complaints' from McDonald's subordinates and peer group 'about the things

that were happening on [McDonald's] unit'"; multiple "quality inspections of McDonald's

areas of responsibility found numerous performance deficiencies and patient safety

concerns"; McDonald lied about her work activities on October 1, 2021; and McDonald

committed two acts of insubordination on October 31, 2021.  Doc. 43-2 at 8-13.

Ultimately, Piedmont leadership believed "McDonald was increasingly disengaged,

exhibited poor leadership and management skills, communicated poorly with peers and

subordinates, and collaborated poorly with peers."  Id. at 9.  Thus, McDonald's

"'longstanding' performance problems," in addition to the two incidents of

insubordination on October 31, 2021, led to her termination.[6]  Id. at 12-13.

---

[6] McDonald argues that Piedmont's reasons for her termination "have shifted over time" and, thus, should not be accepted.  Doc. 50 at 9.  This is contrary to the record—Piedmont has consistently stated that McDonald was terminated because of her continued performance issues and insubordination on October 31, 2021.

For example, during the November 4, 2021 recorded telephone conference, COO Strong and HR Director Walker stated that McDonald was terminated because of her insubordination on October 31, 2021 and because they did not have "confidence" in her leadership abilities.  Doc. 43-6 at 12 (Strong: "Not only [were] my directions not followed, but I am concerned that, given the staffing for the weekend, you didn't feel the need to check in on the department without my direction. Unfortunately, I don't have the confidence that you'll help us lead our nursing teams in the right direction under Piedmont's values and expectations."), 14 (Walker: "Again, the primary reason is, as Scott [Strong] stated, the confidence and your effectiveness in leading our nursing team here is … you know, we just don't have that at this point.").  Thus, McDonald's representation that COO Strong and HR Director Walker only discussed McDonald's failure to "timely check-in on the unit at shift change" during the November 4, 2021 call is false.  Doc. 50 at 9.

Similarly, McDonald contends that Piedmont's interrogatory responses list "several additional reasons for her termination that it had never mentioned before."  Id. at 10 (emphasis added).  Piedmont's

Arguably, McDonald's accounts tend to refute some—but not all—of Piedmont's legitimate non-retaliatory reasons for her termination.[7]  McDonald has not presented evidence to refute Piedmont's contention that she was late to two mandatory MDR meetings or that her subordinates and peers complained about her to COO Strong and CNE Ray.  Instead, McDonald relies on the temporal proximity between her FMLA leave request and termination to demonstrate retaliatory intent.  But that alone is insufficient. *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023) ("That is where [the plaintiff's] retaliatory-firing claim fails—she cites no evidence beyond mere temporal proximity indicating retaliatory intent.").[8]  By contrast, Piedmont "cite[s] its belief" that McDonald was performing poorly and committed insubordination, based on statements from McDonald's subordinates, peers, and supervisors, to support its decision to terminate her employment.  *Id.*  McDonald does not rebut these explanations head on

interrogatory response states that it terminated McDonald "based on her history of performance issues and her misconduct in failing to follow instructions during a critical need period on October 31, 2021." Doc. 53 ¶ 78.  Piedmont also lists specific examples of McDonald's poor performance, including not showing up for mandatory meetings and retaliating against subordinate employees.  *Id.*  "[T]he fact that" Piedmont offers "additional reason[s] for the employment decision … does not suggest pretext if both of the employer's reasons are consistent."  *E.E.O.C. v. TBC Corp.*, 889 F. Supp. 2d 1368, 1377 (S.D. Ga. 2012), *aff'd,* 532 F. App'x 901 (11th Cir. 2013).  Here, Piedmont merely listed out specific examples supporting its belief that McDonald was performing poorly.

Finally, McDonald points to a separation notice that listed the reason for her termination as "involuntary" as evidence of Piedmont's alleged inconsistency.  Doc. 50 at 9-10.  But there is nothing inconsistent about listing McDonald's termination as involuntary—i.e., against McDonald's choice—with Piedmont's position that it fired McDonald because of her performance issues and insubordination.

[7] For example, McDonald's testimony supports her contention that she did not lie to COO Strong about her work activities on October 1, 2021 and that her absence from the September 8, 2021 meeting was permissible.  Doc. 50-3 ¶¶ 31, 59.

[8] Note that McDonald argues temporal proximity to suggest retaliatory intent to meet her burden of establishing pretext.  Docs. 50 at 4; 55 at 4-5.  This is different than arguing temporal proximity to establish the causation element of her prima facie case.  In *Yelling*, the Eleventh Circuit "assumed [the plaintiff] made a prima facie showing" and focused on whether the plaintiff had raised a triable issue of retaliatory intent at the pretext stage of the *McDonnell Douglas* framework.  82 F.4th at 1342.  The court concluded the plaintiff had not demonstrated pretext because the only evidence in support of retaliatory intent was the temporal proximity between her complaints of racism and termination.  *Id.*

and, thus, she has failed to demonstrate pretext.  *Id*.  The Court will address the four

nonretaliatory reasons McDonald fails to rebut.

### a. Attendance at Mandatory Meetings

Piedmont contends that "McDonald often was exceedingly late to … many"

mandatory management meetings.  Doc. 43-1 ¶ 32.  McDonald admits that she was late

to two meetings on October 12 and October 25 but denies that she was "often" late.

Doc. 50-1 ¶ 32.  Regarding the October 12 meeting, McDonald explains she was 42

minutes late because she was "performing her job duties elsewhere in the facility."  Doc.

50-1 ¶ 61.  Similarly, McDonald states she was 38 minutes late to the October 25

meeting because she was finishing up time sheets.  *Id*. ¶ 63.  Piedmont contends that

"performing other job duties" was not an acceptable excuse for arriving late to

mandatory staff meetings.  Docs. 53 ¶ 39; 43-3 ¶ 14.  McDonald has not presented any

evidence to the contrary.  Thus, McDonald has not demonstrated that this reason is

pretextual.

### b. Complaints from Subordinates and Peers

COO Strong and CNE Ray testified that they received complaints from

McDonald's peers and subordinates about her performance.  Docs. 43-1 ¶¶ 42, 51; 43-3

¶¶ 20, 27; 43-4 ¶ 22.  COO Strong and CNE Ray provide three specific examples of

employees who complained about McDonald: Carson Fay, Abi Milwood, and Nora

Gibson.  While McDonald's affidavit denies that these individuals complained about her

to COO Strong or CNE Ray, McDonald, at a minimum, acknowledged that Millwood had

concerns about her leadership and management style during her deposition.  Docs. 45

at 45:24-46:4 (Q: "Well, how did you find out that Abi Millwood had concerns about your

leadership and management style?" A: "When I called Denise [Ray] to share my concerns with her, she shared *those* concerns.") (emphasis added)); 50-1 ¶¶ 40, 44-48, 78-79; 50-3 ¶¶ 46-49, 60-61.  Furthermore, McDonald, unlike COO Strong and CNE Ray, was not present during these conversations and, thus, cannot refute that these conversations occurred.[9]  Rather, McDonald argues this justification is pretextual because she was never given notice of her alleged performance issues as "required" by Piedmont's "progressive disciplinary policy."  Doc. 50 at 12.

"The Eleventh Circuit has indicated that when an employer has established a progressive discipline policy, a plaintiff may establish pretext by showing that the policy was not followed in [her] case."  *TBC Corp.*, 889 F. Supp. 2d at 1378 (citing *Ritchie v. Indus. Steel, Inc.*, 426 F. App'x 867, 873 (11th Cir. 2011); *Morris v. City of Chillicothe*, 512 F.3d 1013, 1020 (8th Cir. 2008)).  "Nevertheless, if management has discretion as to whether to follow the discipline policy, then a failure to follow the policy does not show pretext."  *TBC Corp.*, 889 F. Supp. 2d at 1378.  Although Piedmont had a discipline policy, HR Director Walker and COO Strong testified that the policy was not mandatory.  Docs. 46 at 61:24-62:3 (Strong: "The policy is aspirational.  In an ideal situation, given the circumstances we could have gone through a step by step by step process, but that policy does not require me to do that."); 47 at 71:8-12 (Walker: "[T]he progressive disciplinary process is -- is aspirational in nature.").  Thus, even if Piedmont did not follow the disciplinary policy, its failure would not be evidence of pretext.[10]

---

[9] Notably McDonald did not depose or submit affidavits from these individuals to refute COO Strong's and CNE Ray's account of their complaints.

[10] In any event, Piedmont followed the policy.  The policy states that a "serious offense," including "insubordination," "may result in immediate termination of employment."  Doc. 47-6 at 2.  One of the reasons Piedmont fired McDonald was because of her alleged insubordination on October 31, 2021.  Doc. 52 at 7-8.

c. Perception of McDonald's Performance by Piedmont Leadership

COO Strong and CNE Ray both testified that "[b]y early September 2021," they perceived McDonald was "deficient in many of her management skills and overall job performance."  Docs. 43-3 ¶ 9; 43-4 ¶¶ 9, 17.  "By late September or early October 2021," Piedmont leadership also "agreed that unless there was a sudden and substantial improvement in her engagement, and in her management and leadership abilities, McDonald may likely need to be terminated from her position."  Docs. 43-3 ¶ 35; 43-4 ¶ 26.  McDonald argues that she was not deficient in her job performance and capabilities and cites her July 29, 2021 performance review, conducted by her prior supervisor David Threatt, as evidence of her exemplary performance.  Doc. 50-1 ¶ 28. But a prior performance evaluation from a different supervisor cannot rebut CNE Ray's and COO Strong's perception that McDonald was performing deficiently.  *See Berry*, 84 F.4th at 1304 (noting that a prior positive performance evaluation "does not undermine the legitimacy" of the defendant's "proffered justification" for termination when the "evaluation occurred *before*" the employee's misconduct).

In any event, McDonald's contention that Piedmont's "complaints about the quality of her work were unfounded … is beside the point."  *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).  "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head."  *Id*; *see Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (noting that the pretext inquiry is "limited to whether [the employer] *believed* that [the employee] was guilty of [misconduct]" and whether the employee actually engaged in misconduct is irrelevant).  Here, COO Strong

and CNE Ray consistently and in detail testified that they were disappointed with McDonald's performance.  McDonald's contrary opinion is immaterial.  McDonald does not offer evidence that COO Strong's and CNE Ray's belief, based on unrebutted complaints and reports from McDonald's peers and subordinates, was not genuinely held.  *See Champ v. Calhoun Cnty. Emergency Mgmt. Agency*, 226 F. App'x 908, 916 (11th Cir. 2007) ("[I]t is insufficient to merely dispute whether an incident occurred without presenting evidence that the decision-maker's belief that those incidents occurred was unworthy of credence.") (citing *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005)).  Thus, McDonald has not demonstrated that these complaints were merely a "cover" for retaliation, and it is not the Court's role to "sit as a 'super-personnel department,' and … second-guess the wisdom of an employer's business decisions."  *Alvarez*, 610 F.3d at 1266.

d. Insubordination on October 31, 2021

Finally, Piedmont contends "McDonald's poor work performance and other misconduct culminated in two egregious acts of insubordination that finally led to her termination."  Doc. 43-2 at 12.  Specifically, McDonald failed to comply with COO Strong's instructions to be present at the Sunday morning change-of-shift meeting and contradicted the orders of House Supervisor Wilson.  *Id.* at 5-7.  McDonald admits that COO Strong spoke with her about the October 31 meeting and that House Supervisor Wilson spoke with her about the staffing issue.  Doc. 50 at 5-9.  When asked on November 1, 2021 to explain her absence, McDonald simply said that COO Strong's expectation that she report to the Sunday morning change-of-shift "was not clear" to her "at that time." Doc. 43-6 at 8.  Similarly, McDonald explained that she proposed Claire

continue working on 5 west because the nurses had agreed "amongst themselves" to this arrangement.  *Id*. at 7.  Thus, McDonald does not refute that she did not attend the Sunday morning change-of-shift meeting or that she "proposed" Claire remain on 5 west.  Docs. 43-1 ¶ 114; 50-1 ¶ 114; 50-2 ¶ 64; 53 ¶ 64.  Instead, she argues her decisions were justified.  Doc. 50 at 5-9.

But McDonald's spin on events once again misses the point.  The question is whether COO Strong believed she had been insubordinate.  The text messages exchanged on October 31, 2021 between COO Strong, CNE Ray, and CEO Daughtery confirm that Piedmont leadership expected McDonald to be present for the Sunday morning change-of-shift.  Docs. 43-1 ¶ 118; 43-3 at 23-24; 50-1 ¶ 118 ("Sharon's floors are falling apart.  Scott [Strong] specifically told her to be here at shift change this am.  She is not here and reported to Nurse supervisor she will be here in 2 hours.  I am really I've Rhee [*sic*] lack of leadership.").  And House Supervisor Wilson's statement supports COO Strong's conclusion that McDonald intervened and contradicted her orders.  Doc. 43-3 at 26 ("Floating a nurse from 5 east would put the floor at a 7:1 ratio with a census of 28," which "[d]idn't make any sense.").  Thus, the record supports Piedmont's assertion that COO Strong believed McDonald was insubordinate on October 31, 2021.  *Damon v. Fleming Supermarkets Of Fla., Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct.").

In sum, McDonald has failed to demonstrate that Piedmont's nonretaliatory reasons are pretextual.  But even if McDonald had successfully navigated *McDonnell Douglas* for her FMLA and ADA retaliation claims, those claims nonetheless fail.  *See*

*Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 941 (11th Cir. 2023) ("[T]he ultimate question in a discrimination case is whether there is enough evidence to show that the reason for an adverse employment action was illegal discrimination.  The prima facie case in the *McDonnell Douglas* framework can help answer that question—but it cannot replace it.").  Given the cascade of events, no reasonable jury could find on these facts that her granted request for FMLA leave played any role in her termination.  The only evidence McDonald could possibly cite to suggest retaliatory intent is the fact that she was terminated shortly before her FMLA leave was to begin.  Her request for leave had been promptly granted with no suggestion of concern or opposition and there is not even a hint that her leave played any role in the long list of documented concerns about her job performance.  The answer to the "ultimate question" here is that there simply is no evidence suggesting illegal retaliation.

That brings us back to the causation element of McDonald's prima facie case.  For all the reasons stated, mere temporal proximity, on these facts, is insufficient to carry McDonald's burden of demonstrating "that, but for her attempts to exercise her FMLA rights, she would not have been fired."  *Lapham v. Walgreen Co.*, 88 F.4th 879, 895 (11th Cir. 2023); *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016).

Thus, McDonald has failed to establish a prima facie case, she has failed to establish that all of Piedmont's nonretaliatory reasons are pretextual, and even if she had met her *McDonnell Douglas* burden, McDonald has not come forward with enough evidence for a reasonable factfinder to infer unlawful retaliation.

*2. Convincing Mosaic*

The Court recognizes that "the *McDonnell Douglas* framework 'is not the exclusive means' by which an employee can prove [retaliation] with circumstantial evidence." *Berry*, 84 F.4th at 1310 (quoting *Lee v. Russell Cnty. Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir. 1982)). Thus, McDonald can avoid summary judgment by presenting "a convincing mosaic of circumstantial evidence that raises a reasonable inference of retaliation." *Berry*, 84 F.4th at 1311. "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019)).

Where an employer provides a legitimate, non-retaliatory reason for its adverse action, "the employee *needs* to rebut that explanation." *Berry*, 84 F.4th at 1313 (emphasis added); *see also id.* (Abudu, J., concurring) ("[A]lthough this Circuit treats the pretext analysis under the convincing mosaic approach and the pretext analysis embedded within the *McDonnell Douglas* framework as alternatives, they are—in effect—one and the same."); *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1020 (11th Cir. 2023) ("[T]he convincing mosaic inquiry is identical to the final stage of the *McDonnell Douglas* framework: both ask whether there is enough evidence for a reasonable jury to infer intentional discrimination."). As discussed above, McDonald

cannot demonstrate that Piedmont's proffered reasons are pretextual.  Thus, McDonald's retaliation claims also fail under the convincing mosaic framework.[11]

## B. FMLA Interference Claim

McDonald also brings an FMLA interference claim because she was terminated before she could exercise her FMLA leave.  Doc. 31 ¶¶ 41-50.  "To succeed under a FMLA interference claim, the plaintiff must show only that [she] was 'denied a benefit to which she was entitled under the FMLA.'"  *McAlpin v. Sneads*, 61 F.4th 916, 933 (11th Cir. 2023) (quoting *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1241 (11th Cir. 2010)).  "Generally, 'the employer's motives are irrelevant' to an interference claim.'"  *McAlpin*, 61 F.4th at 933 (quoting *Batson*, 897 F.3d at 1331).  But "[w]here the claim is based on an employee's termination, … an employer may affirmatively defend against the claim by establishing that it would have terminated the employee regardless of her request for or use of FMLA leave."  *Batson*, 897 F.3d at 1331; *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010) ("[A]n employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave.").  Here, as previously explained, Piedmont terminated McDonald because Piedmont leadership believed she was performing poorly and was insubordinate, not because she sought FMLA leave.

---

[11] McDonald points to Piedmont's treatment of Vicky Allen, who was also a Director of Medical Surgical and was not present at the Sunday morning October 31, 2021 change-of-shift meeting, in support of her convincing mosaic argument.  Doc. 55 at 10-11.  But Allen is not a similarly situated comparator because she did not have a history of poor performance.  *See* Doc. 53 ¶ 73; *Lewis*, 918 F.3d at 1220-21 (holding that a similarly situated comparator must "share the plaintiff's employment or disciplinary history").

**C. ADA Discrimination and Failure to Accommodate Claims**

Title I of the ADA makes it unlawful for employers to discriminate against an otherwise qualified individual based on her disability. 42 U.S.C. § 12112(a). Discrimination under the ADA includes an employer's failure to provide a reasonable accommodation and an adverse employment action against an employee because of her disability. *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007). McDonald contends Piedmont did both. Doc. 31 ¶¶ 51-65.

*1. Failure to Accommodate*

To establish a prima facie case of discrimination under the ADA for an employer's failure to accommodate, a plaintiff must show that (1) she is disabled, (2) she is qualified, and (3) her employer failed to provide her with a reasonable accommodation. *Holly*, 492 F.3d at 1255-56.

Piedmont contends that McDonald was not disabled because her neck condition "did not prevent her from working or otherwise limit her physical abilities." Doc. 43-2 at 19. An individual is disabled if she has a "physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(1)(A). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id*. § 12102(2)(A). McDonald testified that her cervical stenosis prevented her from sleeping, affected her appetite and ability to prepare meals, made it difficult to sit or stand for more than 15-20 minutes, made it difficult to drive, and inhibited her ability to bathe, dress, or tie her shoes without assistance. Docs. 50-2 ¶¶ 92-94; 53 ¶¶ 92-94.

Although McDonald was able to continue working, her cervical stenosis substantially limited *other* major life activities, including sleeping, eating, and standing.  Thus, McDonald was disabled under the ADA.

However, McDonald's accommodation claim fails because her request was granted when her FMLA leave was approved.  Although McDonald was not able to exercise her accommodation, that is immaterial.  As the Eleventh Circuit held in *Batson*, "without evidence of a specific instance in which [McDonald] needed an accommodation and was denied one, she cannot establish a failure to accommodate."  897 F.3d at 1336-37.

### 2. Disability Discrimination

Piedmont argues that McDonald's disability discrimination claim fails for the same reasons as her retaliation claims—she cannot demonstrate pretext or causation.  Doc. 43-2 at 21.  As discussed above, the Court agrees.  McDonald has not presented evidence that Piedmont's nonretaliatory reasons are false.  And even if she did, no reasonable jury could find on these facts that McDonald's granted request for FMLA leave played any role in her termination.

## D. Retaliatory Litigation Claim

McDonald claims Piedmont's breach of contract counterclaim was filed in retaliation for her lawsuit.  Doc. 31 ¶¶ 18-40.  A lawsuit or counterclaim against an employee is an adverse employment action only when it lacks a reasonable basis in fact or law.  *See Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 748 (1983) (explaining when an employer's lawsuit may be the basis of a retaliation claim under the National Labor Relations Act); *Smith v. Miami-Dade Cnty.*, 621 F. App'x 955, 960 (11th Cir.

2015) (applying standard in retaliatory litigation claim under the ADA); *Rosania v. Taco Bell of Am., Inc.*, 303 F. Supp. 2d 878, 885-87 (N.D. Ohio 2004) (applying standard in retaliatory litigation claim under the FMLA).

Following Piedmont's acquisition of CMC in August 2021, McDonald was given $7,500, the first installment of the retention bonus.  Docs. 43-1 ¶ 153; 45-4 at 3; 50-1 ¶ 153.  However, under the terms of the retention bonus agreement, if McDonald was terminated "for cause" before July 31, 2022, she would be obligated to repay the bonus.  Docs. 43-1 ¶¶ 11-12; 45-4; 50-1 ¶¶ 11-12.  The agreement defines "cause" to include:

> Employee's gross negligence or willful misconduct (including, but not limited to, acts of fraud, criminal activity, professional misconduct, dishonesty, violation of Piedmont's policies or Code of Conduct, or breach of trust or fiduciary duty) in connection with the performance of the Employee's duties and responsibilities to Piedmont or with regard to Piedmont or its assets.

Doc. 45-4 at 2.  Because McDonald was terminated "for cause" during the retention period, Piedmont claimed she was obligated to repay the first installment of her bonus.  *See* Doc. 24 ¶¶ 60-99.  In response, McDonald amended her complaint to allege a retaliation claim based on Piedmont's breach of contract counterclaim.  Docs. 10 ¶¶ 60-78; 31 ¶¶18-40.

Piedmont later voluntarily dismissed the counterclaim and now moves for summary judgment on McDonald's retaliatory litigation claim.  Docs. 40; 42; 43-2 at 16-22.  Piedmont contends its counterclaim had a reasonable basis in law and fact because McDonald's insubordination on October 31, 2021 constitutes "willful misconduct."  Doc. 52 at 10.  Thus, McDonald's termination was "for cause" and she was obligated to pay back the $7,500.  *Id*.  McDonald contends that Piedmont's breach of contract counterclaim lacked a reasonable basis in law or fact for five reasons:

McDonald's testimony supports her contention that she did not commit insubordination; McDonald was offered severance even though Piedmont's severance policy does not permit severance when an employee is terminated for cause; HR Director Walker told McDonald she did not have to pay back the retention bonus; the retention bonus agreement was between McDonald and Piedmont, not CMC; and Piedmont voluntarily dismissed its counterclaim.  Doc. 50 at 17-18.

McDonald's arguments suggest one weakness in Piedmont's breach of contract counterclaim.  As a practical matter, HR Director Walker's statement during the discussion of the terms of McDonald's termination, whether authorized or not, gave McDonald a strong jury argument to rebut the counterclaim—Piedmont was willing to forgo its clawback as a part of McDonald's termination package.  But that does not change the underlying facts.  The standard is *not* whether Piedmont would "ultimately lose on the merits" of its counterclaim, but whether Piedmont's counterclaim "had no reasonable basis in fact or law to file a counterclaim in the first place."  *Smith*, 621 F. App'x at 960.  Based on COO Strong's testimony, Piedmont had reason to believe McDonald committed insubordination on October 31, 2021 and insubordination, defined as "disobedient to authority," could reasonably fall within "willful misconduct." *Insubordination*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/insubordinate (last visited November 30, 2023).  Thus, Piedmont's counterclaim had a reasonable basis in law and fact and McDonald's retaliatory litigation claim fails.

**IV. CONCLUSION**

For the reasons discussed above, Piedmont's motion for summary judgment

(Doc. 43) is **GRANTED**.

**SO ORDERED**, this 11th day of January, 2024.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
